**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 23 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TRUE OIL COMPANY, Tax Matters
Partner for Neilson-True Partnership,

Petitioner,

v.

COMMISSIONER OF INTERNAL
REVENUE,

Respondent,

----------------------

AMERICAN PETROLEUM
INSTITUTE, MID-CONTINENT OIL
AND GAS ASSOCIATION, THE
ASSOCIATION OF ENERGY
SERVICE COMPANIES, THE
CALIFORNIA INDEPENDENT
PETROLEUM ASSOCIATION, THE
DOMESTIC PETROLEUM
COUNCIL, THE ENERGY
CONSUMERS AND PRODUCERS
ASSOCIATION, THE
INDEPENDENT OIL AND GAS
ASSOCIATION OF NEW YORK,
THE INDEPENDENT OIL AND GAS

No. 97-9029

No. 97-9030

ASSOCIATION OF PENNSYLVANIA, THE INDEPENDENT OIL AND GAS ASSOCIATION OF WEST VIRGINIA, THE INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, THE INDEPENDENT OIL AND GAS ASSOCIATION OF THE MOUNTAIN STATES, THE LOUISIANA INDEPENDENT OIL AND GAS ASSOCIATION, THE MICHIGAN OIL AND GAS ASSOCIATION, THE OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION, THE PERMIAN BASIN PETROLEUM ASSOCIATION, THE ROCKY MOUNTAIN OIL AND GAS ASSOCIATION, AND THE TEXAS INDEPENDENT PRODUCERS AND ROYALTY OWNERS ASSOCIATION, ("AESC"),

Amici Curiae.

---

Appeal from the Decision of the
United States Tax Court
(No. 0090-1:3980-96)
(No. 00900-1:12069-95)

---

Douglas A. Pluss, of Hogan & Hartson, LLP, Denver, Colorado, (Ronald M. Morris, True Oil Company, Casper, Wyoming, with him on the briefs) for Petitioner-Appellant, Nielson-True Partnership, True Oil Company, Tax Matters Partner.

Richard Farber, of Tax Division, Department of Justice, Washington, D.C. (Sara S. Holderness, Tax Division, Department of Justice, Washington, D.C., with him on the brief), for Respondent-Appellee, Commissioner of Internal Revenue.

Stephan G. Dollinger, American Petroleum Institute, Washington, D.C. filed an amici curiae brief for American Petroleum Institute and Mid-Continent Oil and Gas Association.

Denton N. Thomas, Andrews & Kurth L.L.P., Houston, Texas, filed an amici curiae brief for The Association of Energy Service Companies, The California Independent Petroleum Association, The Domestic Petroleum Council, The Energy Consumers and Producers, Association, The Independent Oil and Gas Association of New York, The Independent Oil and Gas Association of Pennsylvania, The Independent Oil and Gas Association of West Virginia, The Independent Petroleum Association of America, The Independent Oil and Gas Association of the Mountain States, The Louisiana Independent Oil and Gas Association, The Michigan Oil and Gas Association, The Oklahoma Independent Petroleum Association, The Permian Basin Petroleum Association, The Rocky Mountain Oil and Gas Association, and The Texas Independent Producers and Royalty Owners Association.

---

Before **ANDERSON, HENRY,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Appellant, True Oil Company, is the tax matters partner[1] for the Nielson-True Partnership, a Wyoming general partnership (the "Partnership"). On its 1991 and 1992 partnership tax returns, the Partnership claimed a credit under

---

[1]"Tax matters partner" is defined at 26 U.S.C. § 6231(a)(7). The designation of a tax matters partner is discussed at length at 26 C.F.R. § 301.6231(a)(7)-1 (1997).

Section 29 of the Internal Revenue Code for the sale of natural gas produced from a well owned by the Partnership. The Commissioner of the Internal Revenue Service (the "Commissioner") denied the credits because the Partnership had not obtained a formal well-category determination for the well from the Colorado Oil and Gas Commission or the Federal Energy Regulatory Commission. The Commissioner took the position that Section 29(c)(2)(A) of the Internal Revenue Code required the Partnership to apply for and obtain a well-category determination before claiming the tax credit. The Partnership challenged the Commissioner's disallowance of the 1991 and 1992 credits by filing a petition with the United States Tax Court. A trial was held and the Tax Court ruled in favor of the Commissioner. *See Nielson-True Partnership v. Comm'r*, 109 T.C. 112 (1997). The Partnership subsequently brought this appeal.

We exercise jurisdiction pursuant to 26 U.S.C. § 7482(a)(1) and **AFFIRM** the decision of the United States Tax Court.

I.      STATUTORY BACKGROUND

A.      *The Natural Gas Policy Act of 1978*

The Natural Gas Policy Act of 1978 ("NGPA") was enacted, in part, to establish price ceilings for wellhead sales of natural gas. *See* Pub. L. No. 95-621, 92 Stat. 3350 (codified as amended at 15 U.S.C. §§ 3301-3432).[2] In an

---

[2]The sections of the NGPA discussed at length *infra*, were repealed by the Natural Gas Wellhead Decontrol Act of 1989. These provisions are hereinafter

effort to provide producers with an incentive to produce fuels that had high production costs, one provision of the NGPA authorized the Federal Energy Regulatory Commission ("FERC") to prescribe incentive price ceilings (i.e., prices higher than the otherwise applicable ceiling prices) for sales of certain types of "high-cost natural gas." *See* NGPA § 107. Section 107(c) of the NGPA specifically identified four types of natural gas deemed to be "high-cost natural gas." *See id*. § 107(c)(1)-(4). In addition, Section 107(c)(5) of the NGPA gave FERC the authority to include in the term "high-cost natural gas" any natural gas "produced under such other conditions as [FERC] determines to present extraordinary risks or costs." *Id*. § 107(c)(5). Pursuant to the authority conferred on it by Section 107(c)(5), FERC ruled that the term "high-cost natural gas" should be extended to include natural gas produced from a tight formation.[3] *See Regulations Covering High-Cost Natural Gas Produced From Tight Formations*, 45 Fed. Reg. 56,034, 56,035 (1980) [hereinafter "Order No. 99"] ("These regulations establish an incentive price ceiling for new and recompletion tight formation gas produced from designated tight formations . . . .").

---

cited to the appropriate section of the NGPA and not to the section of the United States Code at which they were codified.

[3]A tight formation has been defined by FERC as "a sedimentary layer of rock cemented together in a manner that greatly hinders the flow of any gas through the rock." *Regulations Covering High-Cost Natural Gas Produced From Tight Formations*, 45 Fed. Reg. 56,034, 56,034 (1980).

In Order No. 99, FERC promulgated rules delineating the requirements to be met before gas produced from a tight formation qualified for the incentive price. *See id*. at 56,044-46; *see also Pennzoil Co. v. FERC*, 671 F.2d 119, 123-28 (5th Cir. Unit A 1982). A producer could not charge an incentive price for any high-cost natural gas, including natural gas obtained from a tight formation, until it first satisfied all the requirements established by FERC. *See Oxy U.S.A., Inc. v. Seagull Natural Gas Co.*, 949 F.2d 799, 801 (5th Cir. 1992). One of these requirements obligated the producer to obtain a tight formation designation for the specific well producing the gas. *See id*.

Section 503(a) of the NGPA authorized jurisdictional agencies[4] to classify tight formations by applying the definition of high-cost natural gas under Section 107(c) of the NGPA and the guidelines promulgated by FERC. *See* NGPA § 503(a)(1)(D); *see also Marathon Oil Co. v. FERC*, 68 F.3d 1376, 1377 (D.C. Cir. 1995) ("Section 503 of the NGPA establishes the procedures that govern the determination of whether a particular type of natural gas is tight formation gas."); *Williston Basin Interstate Pipeline Co. v. FERC*, 816 F.2d 777, 780 (D.C. Cir. 1987). In Order No. 99, FERC set forth the guidelines to be applied by jurisdictional agencies when designating tight formations. *See* 45 Fed. Reg. at

---

[4]A jurisdictional agency is the federal or state agency "that governs the drilling of wells on the particular site for which high-cost designation is requested." *Williston Basin Interstate Pipeline Co. v. FERC*, 816 F.2d 777, 780 (D.C. Cir. 1987).

56,035 ("The guidelines for identifying tight formations contain standards regarding permeability, gas productivity, and production of associated oil.").  A four-step process by which a producer obtained a tight formation designation was set forth by FERC in Order No. 99.[5]  *See Oxy U.S.A., Inc.,* 949 F.2d at 801.  Until the producer obtained a determination from FERC that a specific well was producing gas from a tight formation (commonly referred to as a "well-category determination"), it could not charge the incentive price for the gas produced from that well.  *See id.*; *see also* 45 Fed. Reg. at 56,035 ("[T]he price incentives in the final rule are available only for gas produced from tight formations that are designated in accordance with the procedures set forth in the rule.").

Sections 107 and 503 of the NGPA were repealed effective January 1, 1993, by the Natural Gas Wellhead Decontrol Act of 1989.  *See* Pub. L. No. 101-60, 103 Stat. 157 (1989).  As a result, price controls on wellhead sales of natural gas were eliminated and incentive prices for tight formation gas produced from

---

[5]This four-step process has been succinctly summarized as follows: "First, the local regulatory authority . . . had to recommend that a field be designated a tight formation.  Second, the FERC had to designate the field as a tight formation.  Third, the local regulatory authority had to recommend that a specific well be classified as a tight formation well.  Fourth, the FERC had to approve the recommendation designating that well as producing tight formation gas." *Oxy U.S.A., Inc. v. Seagull Natural Gas Co.*, 949 F.2d 799, 801 (5th Cir. 1992) (footnotes omitted).

wells spudded or recompleted[6] after May 12, 1990 were abolished.  *See*

*Marathon Oil Co.*, 68 F.3d at 1377.  Thereafter, FERC announced that it would

"not accept determinations where the well was spudded or recompletion

commenced on or after January 1, 1993."  *Qualifying Certain Tight Formation*

*Gas for Tax Credit*, 58 Fed. Reg. 38,528, 38,529 n.12 (1993).  Further, FERC

stated that it would not review initial determinations made by a jurisdictional

agency unless the producer filed its application with the jurisdictional agency on

or before December 31, 1992, and the jurisdictional agency forwarded its initial

determination to FERC on or before April 30, 1994.  *See id*. at 38,529-30.

B.     <u>Section 29 of the Internal Revenue Code</u>

Two years after the enactment of the NGPA, Congress enacted Section 29

of the Internal Revenue Code ("Section 29")[7] as part of the Crude Oil Windfall

Profit Tax Act of 1980.  *See* Pub. L. No. 96-223, § 231(a), 94 Stat. 229, 97-98

(codified as amended at 26 U.S.C. § 29).  Section 29 allowed taxpayers to claim a

credit for the production and sale of certain qualified fuels (the "Section 29

---

[6]FERC has held that a recompletion "occurs when the producer reenters a well to complete (i.e., perforate) a new formation from that in which a well has previously been completed." *Railroad Comm'n of Texas*, 66 F.E.R.C. ¶ 61,130, 1994 WL 24276, at *4 (Jan. 28, 1994).

[7]Section 29 was originally designated as Section 44D by the Crude Oil Windfall Profit Tax Act of 1980, Pub. L. 96-223, § 231(a), 94 Stat. 229, 97-98. Section 44D was redesignated as Section 29 by the Deficit Reduction Act of 1984, Pub. L. 98-369, § 471(c)(1), 98 Stat. 494, 771.

Credit"). *See* 26 U.S.C. § 29(a).[8]  A taxpayer, however, was precluded from claiming the Section 29 Credit if it had charged the incentive price allowed under the NGPA for the same gas.  *See* 26 U.S.C. § 29(e).  As a result of the amendments made to Section 29 by the Revenue Reconciliation Act of 1990, the Section 29 Credit became available only for qualified fuels produced from wells drilled after December 31, 1979 and before January 1, 1993, and sold to an unrelated third party before January 1, 2003.  *See* 26 U.S.C. § 29(f); Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 11501, 104 Stat. 1388, 1330.

The term "qualified fuels" is defined in Section 29 to include gas produced from "geopressured brine, Devonian shale, coal seams, or a tight formation."  26 U.S.C. § 29(c)(1)(B)(i).  The term "tight formation" is not defined anywhere in Section 29 or in any other section of the Internal Revenue Code.[9]  Section 29,

---

[8]Unless otherwise specified, all references are to the 1991 edition of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder.

[9]The term "tight formation" appeared in only one other section of the 1991 edition of the Internal Revenue Code of 1986.  That section, which dealt with adjustments in computing alternative minimum taxable income, concluded with the following language: "except that this clause shall not apply to a gas well if the gas is produced (or to be produced) from Devonian shale, coal seams, or a tight formation (determined in a manner similar to the manner under section 29(c)(2))."  26 U.S.C. § 56(h)(6)(B)(iii) (repealed 1992).

however, contains the following language: "the determination of whether any gas is produced from geopressured brine, Devonian shale, coal seams, or a tight formation shall be made in accordance with section 503 of the Natural Gas Policy Act of 1978." *Id*. at § 29(c)(2)(A). Although Section 29 has been amended more than once since the repeal of Section 503 of the NGPA, Congress has never deleted the reference to Section 503 from Section 29.

II.    FACTUAL BACKGROUND

The parties stipulated to facts concerning the events which led to the Commissioner's disallowance of the Section 29 Credits claimed by the Partnership. A summary of these facts follows.

The Partnership was formed in 1983 to drill two wells in a natural gas field located in northern Colorado and known as the Wattenberg Field. Amoco Production Company ("Amoco") was designated the operator of the Wattenberg Field. Amoco entered into a drilling contract and drilling began on the wells in 1983. Both wells were completed by April 3, 1984. One well was known as the Alvin Vonasek "B" well (the "Vonasek Well") and the other was known as the Castor Hanson True well (the "Hanson Well"). Both wells were drilled in the "J" Sand formation of the Wattenberg Field and produce gas only from that formation. FERC has determined that the "J" Sand formation is a tight formation.

Amoco prepared and submitted a well-determination application to the Colorado Oil and Gas Commission ("COGC") for the Vonasek Well. The COGC subsequently issued a determination that the Vonasek Well was producing gas from a tight formation. This determination was not reversed by FERC. No well-determination application for the Hanson Well was prepared or submitted to the COGC and, therefore, neither the COGC nor FERC ever determined that the Hanson Well was producing gas from a tight formation. There was no impediment to the filing of a well-determination application for the Hanson Well.

In 1991 and again in 1992, the Partnership claimed the Section 29 Credit on its partnership income tax return for gas produced from both the Vonasek Well and the Hanson Well. The Commissioner disallowed the portion of the Section 29 Credit claimed in both years which was attributable to sales of gas produced from the Hanson Well. The Commissioner did not disallow the Section 29 Credits claimed for gas produced from the Vonasek Well. The 1991 and 1992 Section 29 Credits for the Hanson Well were disallowed on the grounds that no determination had ever been made by COGC or FERC that the Hanson Well was producing gas from a tight formation.

The Partnership filed a petition with the United States Tax Court challenging the Commissioner's disallowance of the 1991 and 1992 Section 29 Credits for the Hanson Well. The Tax Court held in favor of the Commissioner

and ruled that "an individual well-category determination must be obtained in order to qualify for the section 29 tax credit attributable to tight formation gas." *Nielson-True Partnership,* 109 T.C. at 125.

III.    DISCUSSION

A.    *Standard of Review*

This court reviews decisions of the United States Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). The sole issue in this appeal is the interpretation of Section 29(c)(2)(A) of the Internal Revenue Code. The interpretation of a federal statute is a question of law which this court reviews *de novo*. *See Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir. 1995).

B.    *Section 29 of the Internal Revenue Code*

The specific language of the statute at issue reads as follows:

> In general.–Except as provided in subparagraph (B), *the determination of whether any gas is produced from* geopressured brine, Devonian Shale, coal seams, or *a tight formation shall be made in accordance with section 503 of the Natural Gas Policy Act of 1978.*

26 U.S.C. § 29(c)(2)(A) (emphasis added). The sole issue before this court is the interpretation of the word "determination" as used in Section 29(c)(2)(A). The Commissioner argues that "determination," as used in the statute, means a formal well-category determination issued by a jurisdictional agency and reviewed by

-12-

FERC pursuant to the procedures specifically set forth in Section 503 of the NGPA and the regulations promulgated by FERC. Conversely, the Partnership argues that "determination" does not mean a well-category determination issued by a jurisdictional agency and reviewed by FERC. At the core of the Partnership's argument is its position that by referencing Section 503 of the NGPA in Section 29(c)(2)(A), Congress merely intended to incorporate the substantive definitions of tight formation gas promulgated by FERC in connection with its implementation of Section 503 of the NGPA. The Partnership asserts that, for purposes of Section 29(c)(2)(A), the initial determination of whether a well is producing from a tight formation can be made by a taxpayer by applying the definitions, guidelines, and standards promulgated by FERC.

"The starting point in any case involving statutory construction is the language of the statute itself. When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances." *Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1460 (10th Cir. 1997) (citation and quotation omitted). When interpreting statutory language, however, appellate courts must examine the disputed language in context, not in isolation. This court "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v.*

*Cartier, Inc.*, 486 U.S. 281, 291 (1988). The definition and usage of the word "determination" must be reviewed within this framework.

The word "determination" is not defined in the Internal Revenue Code. "In interpreting the meaning of the words in a revenue Act, we look to the ordinary, everyday senses of the words." *Comm'r v. Soliman*, 506 U.S. 168, 174 (1993) (quotation omitted). When Congress does not define a word, its "common and ordinary usage may be obtained by reference to a dictionary." *United States v. Roberts*, 88 F.3d 872, 877 (10th Cir.1996). "Determination" is defined in Black's Law Dictionary as "[t]he decision of a court or administrative agency." *Black's Law Dictionary* 450 (6th ed. 1990). The primary definition of "determination" in Webster's is "the settling and ending of a controversy [especially] by judicial decision." *Webster's Third New Int'l Dictionary* 616 (1993). A secondary definition provided by Webster's is "a fixing of the position, magnitude, or character of something." *Id.*

Both the Partnership's and the Commissioner's interpretation of Section 29(c)(2)(A) are consistent with the definition of "determination" obtained by dictionary reference. The only point on which the parties appear to agree is that the Section 29 Credit cannot be claimed unless there is a determination that a well is producing natural gas from a tight formation. They disagree, however, on who has the authority to make that determination. The Partnership argues that

-14-

the initial determination may be made by the taxpayer claiming the Section 29 Credit; the Commissioner argues that the determination must be made by FERC. The current controversy, therefore, cannot be conclusively resolved simply by applying a dictionary definition of "determination."

The statute, however, cannot be interpreted by looking solely at the word "determination." *See K Mart Corp.*, 486 U.S. at 291 (noting that a court must look to both the particular language at issue and the statute as a whole). The word must be placed in context with the remaining language of the statute which requires that the determination of whether a well is producing natural gas from a tight formation be made "in accordance with section 503 of the Natural Gas Policy Act of 1978." 26 U.S.C. § 29(c)(2)(A).

The Partnership argues that Section 503 is implicated in the process of making a determination under Section 29(c)(2)(A) only to the extent that it directs the person or entity making the determination to apply the definitions and other criteria promulgated by FERC. In essence, the Partnership argues that the reference to Section 503 in Section 29(c)(2)(A) is substantive, not procedural, and that Section 29(c)(2)(A) only states a requirement concerning the substance of a determination, not the procedure to be followed when obtaining it. The Partnership's argument, however, misinterprets Section 503 which is wholly procedural and neither contains nor refers to any definitions, guidelines, or other

substantive criteria which would assist either a taxpayer or a jurisdictional agency in determining whether gas is being produced from a tight formation.

Section 503 sets forth a detailed and inflexible procedure by which initial well-category determinations made by *jurisdictional agencies* are reviewed by FERC. *See Marathon Oil Co.,* 68 F.3d at 1377; *Williston Basin Interstate Pipeline Co.*, 816 F.2d at 780. Section 503 confers the authority to make the determination of whether gas is producing from a tight formation only on jurisdictional agencies. *See* NGPA § 503(c)(1) ("A Federal or State agency having regulatory jurisdiction with respect to the production of natural gas is authorized to make determinations referred to in subsection (a)."). FERC has interpreted the language of Section 503 to allow only jurisdictional agencies to designate tight formations. *See* 45 Fed. Reg. at 56,035 ("The designation procedure begins with the jurisdictional agency."). The guidelines to be used by a *jurisdictional agency* in making tight formation designations are set forth in regulations promulgated by FERC. *See id.* at 56,034-46.

Section 29(c)(2)(A) specifically refers only to Section 503 of the NGPA and not to the regulations, definitions, guidelines or standards promulgated by FERC in connection with its implementation of that section. Like Section 29, Section 503 does not contain any definition of the term "tight formation." Section 503 refers only to the definition of "high-cost natural gas" in Section

107(c) of the NGPA. *See* NGPA § 503(a)(1)(D). That definition, in turn, does not define or offer standards to determine what is a "tight formation." The remainder of Section 503 only details the process by which these initial determinations are subsequently reviewed by FERC and, in some instances, a United States Court of Appeals.

Section 29(c)(2)(B)(i), the statutory provision which immediately follows the portion of Section 29 in dispute, explicitly refers to definitions contained in the NGPA.[10] This illustrates that Congress knew the difference between incorporating substantive provisions like those referenced in Section 29(c)(2)(B)(i), and incorporating the purely procedural provisions of Section 503. Therefore, the plain language of Section 29(c)(2)(A) provides no support for the Partnership's argument that Congress intended to incorporate substantive provisions in Section 29(c)(2)(A), including the definitions set forth in either the NGPA or regulations promulgated by FERC. The most rational explanation for the reference to Section 503 found in Section 29(c)(2)(A) is that Congress intended a taxpayer to follow the procedures set forth in Section 503 before the Section 29 Credit could be claimed.

---

[10]Section 29(c)(2)(B)(i) identifies Section 2(18) of the NGPA as the source for the definition of the phrase "committed or dedicated to interstate commerce," and reads as follows: "which, as of April 20, 1977, was committed or dedicated to interstate commerce (*as defined in* section 2(18) of the Natural Gas Policy Act of 1978, as in effect on the date of the enactment of this clause)." 26 U.S.C. § 29(c)(2)(B)(i) (emphasis added).

C.    *The Natural Gas Policy Act*

1.    *Section 107(b)*

When interpreting statutory language, this court looks not only at the specific statute at issue, but also examines that statute in context with related statutes. *See ABC Rentals of San Antonio, Inc. v. Comm'r*, 142 F.3d 1200, 1207 (10th Cir. 1998). Because the Section 29 Credit and the pricing incentives allowed by Section 107(b) of the NGPA are so closely interrelated, our interpretation of Section 29(c)(2)(A) must include an analysis of the interplay between the two statutes.

Section 29 provides that a producer who charged an incentive price for natural gas may not claim the Section 29 Credit for the same gas. *See* 26 U.S.C. § 29(e). A similar provision in Section 107(d) of the NGPA requires a producer to choose between claiming the incentive price allowed by Section 107(b) or a tax credit, exemption, or deduction for the natural gas. *See* NGPA § 107(d).

The Partnership's interpretation of Section 29(c)(2)(A), taken to its logical extreme, would allow a producer to claim the Section 29 Credit even though either a jurisdictional agency or FERC had ruled that the same gas was not being produced from a tight formation. Thus, a producer who had received an adverse ruling from a jurisdictional agency or from FERC could retain its own expert to opine that the well was producing gas from a tight formation. Based on the

-18-

expert's analysis, the taxpayer could claim the Section 29 Credit notwithstanding that FERC had determined the same well was not producing gas from a tight formation. In light of the statutory requirement in both Section 29(e) of the Internal Revenue Code and Section 107(d) of the NGPA that producers must choose between claiming the Section 29 Credit or charging the incentive price for the same gas, Congress could not have intended a tax credit inconsistent with a FERC determination. Interpreting Section 29(c)(2)(A) to require a producer to obtain a well-category determination from a jurisdictional agency or FERC, therefore, is consistent with the restriction imposed on a producer by both Section 107(b) of the NGPA and Section 29(e) of the Internal Revenue Code.

     2.     *Section 107(c)*

The Partnership concedes that a producer could not claim the incentive price allowed by the NGPA unless it first obtained a well-category determination in accordance with the procedures set forth in Section 503 and the regulations promulgated by FERC. This requirement was imposed on a producer by Section 107(c) of the NGPA which defined "high-cost natural gas" as "natural gas determined in accordance with section 503" to be produced from geopressured brine, Devonian shale, coal seams, or a tight formation. *See* NGPA § 107(c). The language of Section 107(c) of the NGPA which references Section 503 is strikingly similar to the language of Section 29(c)(2)(A) referencing Section 503.

The two statutes should thus be construed harmoniously. *See Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir. 1991).

Section 107(c) has been consistently interpreted by FERC and by the courts to require a producer to obtain a formal well-category determination from FERC for a specific well before charging an incentive price for the gas produced from that well. *See* 45 Fed. Reg. at 56,035; *Oxy U.S.A., Inc.,* 949 F.2d at 801. This court can only conclude that Congress intended the language it used in Section 29(c)(2)(A) to have the same meaning as the almost identical language it used in Section 107(c).

Construing Section 29 of the Internal Revenue Code and Sections 107 and 503 of the NGPA in harmony leads to the conclusion that Section 29(c)(2)(A) requires a producer to obtain a formal well-category determination before it can claim the Section 29 Credit.

D.   *Legislative History*

The Partnership contends that the legislative history of Section 29 suggests a well-category determination is not a prerequisite to claiming the Section 29 Credit. Once this court has determined that the language of a statute is clear and unambiguous, it will review legislative history only for the narrow and limited purpose of ascertaining whether it contains "a clearly expressed legislative intent to the contrary." *See Miller v. Comm'r*, 836 F.2d 1274, 1283 (10th Cir. 1988)

-20-

(quotation omitted). "Legislative history should be used to resolve ambiguity, not create it." *Id.*

In its brief, the Partnership specifically argues that reports prepared by both the Senate Finance Committee and the House Ways and Means Committee are "replete with references to the *definition* of tight formation gas as determined by FERC." The Partnership asserts that the only reasonable conclusion to be drawn from the recurring use of this term is that Congress intended to incorporate in Section 29(c)(2)(A) only the substantive definition of tight formation gas and not the procedural formalities of Section 503 of the NGPA. While the term "definition" does appear with regularity in the legislative history, it is more significant that the word is conspicuously absent from Section 29(c)(2)(A), itself, the final word from Congress. Our review of the legislative history reveals nothing that could be construed as a clearly expressed congressional intent that is contrary to the plain language of the statute.

E.    *Prior Interpretations*

This court is bound to give effect to unambiguous statutory language unless to do so would lead to absurd results. *See United States v. Reider*, 103 F.3d 99, 103 (10th Cir. 1996). Contrary to arguments made by the Partnership, an interpretation of Section 29(c)(2)(A) to require a formal well-category

determination does not result in an absurd result or one that is contrary to existing case law or prior rulings issued by the Commissioner or FERC.

### 1.    *Existing Case Law*

The Partnership cites two cases in support of its position that a taxpayer is entitled to claim the Section 29 Credit without first obtaining a formal well-category determination.  Neither case, however, involved the interpretation of Section 29(c)(2)(A) and, therefore, the Partnership's reliance on the cases is misplaced.  In both cases, the Section 29(c)(2)(A) issue arose in the context of a jurisdictional question.

The first case involved a refusal by FERC to review a jurisdictional agency's determination that a well was producing tight formation gas.  *See Marathon Oil Co.,* 68 F.3d at 1377.  FERC refused to review the determination because, at the time the request was made, Section 503 of the NGPA had been repealed and FERC was no longer issuing well-category determinations.  *See id*. at 1378.  The producer argued that FERC's refusal to review the determination would jeopardize its ability to claim the Section 29 Credit.  *See id*. at 1378.  The court noted that the producer had received a positive determination from a jurisdictional agency and was only seeking FERC approval of that determination. The court refused to exercise jurisdiction, holding that, until the IRS disallowed the Section 29 Credit, the producer had not suffered any injury and, therefore,

lacked standing. *See id.* at 1378-79. The court suggested that the positive determination received from the jurisdictional agency determination could be used to substantiate the producer's claim that it was entitled to the Section 29 Credit. *See id.* at 1379. The Partnership argues that interpreting Section 29(c)(2)(A) to require a well-category determination would be directly contrary to the holding in *Marathon Oil*.

In the second case cited by the Partnership, FERC reversed a jurisdictional agency's determination that a well was producing gas from geopressured brine, another fuel which qualifies for the Section 29 Credit. *See WRT Energy Corp. v. FERC*, 107 F.3d 314, 315 (5th Cir. 1997). Because the NGPA had been repealed, FERC's action had no effect on the price at which the producer could sell the gas. *See id.* at 317. The producer requested the court to reverse FERC's ruling and argued that, although FERC's ruling had no pricing consequence, it jeopardized the producer's ability to claim the Section 29 Credit. *See id.* at 317-18. The court concluded that it had jurisdiction to review FERC's reversal of the jurisdictional agency's determination because the ruling by FERC had the potential to adversely affect the producer's ability to claim the Section 29 Credit. *See id.* The court, however, made it clear that Section 29 was not at issue in the case. *See id.* at 316 ("But, remaining is the potential tax benefit, which is not directly at issue in this proceeding . . . .").

While these courts concluded that a determination by FERC is not dispositive as to the Section 29 Credit, neither court cited any authority or provided any analysis to substantiate this conclusion. The provisions of Section 29 were not analyzed or even discussed in either opinion. Neither case directly addressed the issue currently before this court but discussed the Section 29 Credit only in the context of resolving a jurisdictional issue. Accordingly, this court declines to give any authoritative weight to the dicta in either *Marathon Oil* or *WRT*.

### 2.    *Prior Rulings Issued by the Commissioner*

The Partnership's argument that Private Letter Rulings, Technical Advice Memoranda, and Revenue Rulings previously issued by the Commissioner support its position is similarly misplaced. Both parties concede that because the private letter rulings and technical advice memoranda were not issued specifically to the Partnership, they cannot be used or cited as precedent. *See* 26 U.S.C. § 6110(k)(3) (1998). Nevertheless, "[w]hile private letter rulings are not binding authority, they may be cited as evidence of administrative interpretation." *ABC Rentals of San Antonio, Inc.*, 142 F.3d at 1207 n.5. This court, however, will not defer to an agency's interpretation of a statute if that interpretation conflicts with the plain language of the statute. *See Sundance Assocs., Inc. v. Reno*, 139 F.3d 804, 807 (10th Cir. 1998).

With the exception of Private Letter Ruling 88-29-066, the fact situation in each unpublished ruling cited by the Partnership is essentially the same:[11] a producer who sought to claim the Section 29 Credit had not yet obtained a formal well-category determination from FERC although it had filed a determination application with a jurisdictional agency and was awaiting action by FERC. *See Priv. Ltr. Rul.* 92-34-015 (Aug. 21, 1992) ("Thus, the Taxpayer awaits only the formality of a determination under section 503 of the NGPA from the FERC. The Taxpayer expects that the FERC will make such a determination in the near future."); *Priv. Ltr. Rul.* 91-35-028 (Aug. 30, 1991); *Priv. Ltr. Rul.* 93-27-061 (July 9, 1993); *Priv. Ltr. Rul.* 91-28-022 (July 12, 1991); *Priv. Ltr. Rul.* 89-34-067 (Aug. 25, 1989); *Tech. Adv. Mem.* 88-48-001 (Dec. 2, 1988). In each ruling, the Commissioner concluded that the *temporary* lack of a formal well-category determination did not bar the producer from claiming the Section 29 Credit for fuel sold during the year in question. *See*, *e.g.*, *Priv. Ltr. Rul.* 93-27-061 ("The temporary lack of a determination by the FERC . . . does not cause the production

---

[11]Private letter ruling 88-29-066 was issued to a taxpayer who represented that it did not intend to charge an incentive price for coal seam methane it produced and requested a ruling that it would not be precluded by Section 29(e)(1) from claiming the Section 29 Credit. *See Priv. Ltr. Rul.* 88-29-066 (July 22, 1988). The Internal Revenue Service ruled that the producer could claim the tax credit because the gas would not be sold at an incentive price. The ruling contains a vague reference to the fact that the producer did not intend to file a determination application but, contrary to the other rulings cited by the Partnership, does not directly address any of the requirements of Section 29 including Section 29(c)(2)(A) or the drilling date requirements of Section 29(f).

-25-

from such wells to fail to qualify for the section 29 credit."). Each of these rulings clearly and unambiguously stated that the ruling was contingent on the taxpayer's eventual receipt of a well-category determination. Three of the rulings cited by the Partnership conclude with the following language: "The above rulings are predicated upon [your] receipt of favorable determinations from the appropriate agencies that production from each well is obtained from . . . tight formations." *Priv. Ltr. Rul.* 92-34-015 (Aug. 21, 1992); *see also Priv. Ltr. Rul.* 91-28-022 (July 12, 1991); *Priv. Ltr. Rul.* 91-35-028 (Aug. 30, 1991).

Thus, the Partnership's assertion, taken on its face, that these rulings stand for the proposition that a formal well-category determination is not a *prerequisite* to claiming the Section 29 Credit is literally correct. The rulings, however, do not stand for the proposition advanced by the Partnership that a well-category determination is not eventually required before gas qualifies for the Section 29 Credit. Each unpublished ruling contemplated that a well-category determination would eventually be forthcoming from FERC; the taxpayer was allowed to claim the Section 29 Credit with the understanding that the credit would be disallowed if the taxpayer received an adverse ruling from FERC. Therefore, the Commissioner's interpretation of Section 29(c)(2)(A), as expressed in all the relevant unpublished rulings cited by the Partnership, is consistent with the interpretation reached by this court.

The Partnership also argues that requiring a formal well-category determination would directly conflict with the holding in a recently issued revenue ruling. *See Rev. Rul.* 93-54, 1993-2 C.B. 3. The holding of the revenue ruling was as follows:

> If a well that is drilled after December 31, 1979, and before January 1, 1993, is recompleted after January 1, 1993, to produce fuel that is a qualified fuel under section 29(c) of the Code and if the recompletion does not involve additional drilling to deepen or extend the well, the fuel produced from the recompletion qualifies for the section 29 credit.

*Id.* Only one month before the revenue ruling was published, however, FERC announced that it would not review determination applications "where the well was spudded or recompletion commenced on or after January 1, 1993." 58 Fed. Reg. at 38,529 n.12. Therefore, it would have been impossible for a producer who recompleted a well after January 1, 1993, in accord with revenue ruling 93-54, to file a determination application and obtain a well-category determination from FERC.

The Partnership argues that, because it is impossible to obtain a well-category determination for a well recompleted after January 1, 1993 (because FERC will no longer issue one), the only conclusion that can be drawn from the revenue ruling is that a well-category determination is not necessary to qualify for the Section 29 Credit. The Partnership contends that the revenue ruling would otherwise be meaningless.

-27-

Revenue ruling 93-54, like the cases cited by the Partnership, did not deal directly with the issue of the well-category determination. The revenue ruling addressed only the drilling date requirement of Section 29(f) of the Internal Revenue Code that the qualified fuels must be produced from a well drilled after December 31, 1979, and before January 1, 1993. The revenue ruling does not expressly discuss Section 29(c)(2)(A)'s requirement of a well-category determination. *See American Stores Co. v. Comm'r*, 1999 WL 122996, at *12 (10th Cir. 1999) (commenting that a taxpayer's slanted interpretation of a revenue ruling that does not otherwise state a clear standard cannot be used as support for the taxpayer's position).

Revenue rulings issued by the Commissioner do not have the same force and effect as treasury regulations and are not binding on this court. *See ABC Rentals of San Antonio, Inc.,* 142 F.3d at 1205. "Revenue rulings do not have the force and effect of law, but rather are offered for the guidance of taxpayers, IRS officials, and others concerned; although they are entitled to some consideration, they do not control when contrary to statute or the expressed intention of Congress." *Storm Plastics, Inc. v. United States*, 770 F.2d 148, 154 (10th Cir. 1985). Consequently, to the extent that revenue ruling 93-54 could be interpreted to directly conflict with the plain language of Section 29(c)(2)(A), it has no precedential value to this court. Therefore, this court declines to give revenue

ruling 93-54 any weight for the proposition that a producer does not have to obtain a formal well-category determination before claiming the Section 29 Credit.

While it is apparently true that a well recompleted after January 1, 1993 will not qualify for the Section 29 Credit because it is no longer possible to obtain a well-category determination, this court is not at liberty to ignore the plain language of the statute and hold that a well-category determination is not required to claim the Section 29 Credit. It is the responsibility of this court to interpret statutes, not rewrite them. *See Badaracco v. Comm'r*, 464 U.S. 386, 398 (1984) ("Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement."). It is within the prerogative of Congress to amend Section 29 to eliminate the requirement of a formal well-category determination for wells recompleted after January 1, 1993.

### 3. *FERC Rulings*

The Partnership argues that a statement made by FERC in 1994 signifies FERC's position that Section 29(c)(2)(A) does not require a producer to obtain a formal well-category determination. In a ruling wherein FERC refused to issue a well-category determination, FERC stated in a footnote, "[t]he IRS has the responsibility to determine whether production from a well that has not received a determination under NGPA section 503 is eligible for a tax credit." *Railroad*

*Comm'n of Texas*, 66 F.E.R.C. ¶ 61130 n.12, 1994 WL 24276, at *5 (Jan. 28, 1994).  The Partnership interprets this statement as a pronouncement by FERC that a well-category determination is not necessary to qualify for the Section 29 Credit.  Arguably, however, this statement only acknowledges the undeniable fact that the Commissioner, and not FERC, has the authority to interpret Section 29(c)(2)(A).  The Partnership concedes in its brief, moreover, that FERC has also issued several orders in which it expressly stated that a well-category determination was necessary to qualify for the Section 29 Credit.  *See*, *e.g.*, 58 Fed. Reg. at 38,528 ("[W]hile NGPA Section 107 well category determinations have no price consequence, they are necessary to obtain the Section 29 tax credit.").  The Partnership contends that FERC has taken an inconsistent position with respect to the well-category determinations but argues that its earlier pronouncements requiring well-category determinations for the Section 29 Credit were erroneous.

Even assuming that the statement appearing in *Railroad Comm'n of Texas* represents FERC's departure from its earlier position that a well-category determination was necessary to obtain the Section 29 Credit, this court declines to give any weight to FERC's articulated positions on the Section 29 issue. FERC has no Congressional authority to interpret any provision of the Internal

Revenue Code; its interpretation of Section 29(c)(2)(A) is irrelevant to our analysis.

### 4. *Self-Assessment of Federal Taxes*

The Partnership also argues that the tax system is one of self-assessment and, therefore, it should be up to the taxpayer to determine, subject to audit, whether it is entitled to claim a credit or deduction allowed by the Internal Revenue Code. The Partnership repeatedly argues that obtaining a well-category determination is just one way a taxpayer, if audited, can substantiate its position that it is entitled to the Section 29 Credit. While it is true that the federal income tax system is one of self-assessment, any requirements imposed by the Internal Revenue Code must be followed before credits or deductions can be claimed by a taxpayer. Other provisions of the Internal Revenue Code require a taxpayer to obtain supplemental documentation before claiming a credit or deduction. *See*, *e.g.*, 26 U.S.C. § 170(a)(1); 26 C.F.R. § 1.170A-13(c) (requiring a taxpayer to obtain an appraisal from a "qualified appraiser" before a charitable deduction can be claimed for gifts of certain property.). Therefore, our interpretation of Section 29(c)(2)(A) to require a well-category determination before the Section 29 Credit can be claimed is not absurd or unreasonable in light of other provisions of the Internal Revenue Code which require credits or deductions to be substantiated before they can be claimed.

V.   CONCLUSION

Our analysis of Section 29(c)(2)(A) leads to the conclusion that the language used therein is clear and unambiguous.  A producer must obtain a formal well-category determination before it can claim the Section 29 Credit. Nothing in the legislative history of the statute indicates a clear congressional intent to the contrary.  Additionally, this interpretation of Section 29(c)(2)(A) does not lead to absurd or unreasonable results.  Although the result of our holding may appear unfair to producers who failed to obtain well-category determinations while they were being issued by FERC or to those producers who recomplete their wells after January 1, 1993, the judiciary is not "licensed to attempt to soften the clear import of Congress' chosen words whenever a court believes those words lead to a harsh result."  *United States v. Locke*, 471 U.S. 84, 95 (1985).

This court, therefore, **AFFIRMS** the decision of the United States Tax Court.